Matthew J. Langley
California Bar No. 342846
**ALMEIDA LAW GROUP LLC**
849 W. Webster Avenue
Chicago, Illinois 60614
t: 773-554-9354
matt@almeidalawgroup.com

*Attorney for Plaintiff & the Putative Class*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

# SOUTHERN DIVISION

| | |
|---|---|
| JOHN AVOTS-SMITH, individually and *on behalf of himself and all others similarly situated*, <br><br><br> Plaintiff, <br><br> vs. <br><br><br> THRIVE HEALTH GROUP, INC., *d/b/a* FRIDAYS, <br><br> Defendant. | Case No.: <br><br> **<u>CLASS ACTION COMPLAINT</u>** <br><br> 1. 1.VIOLATION OF THE ELECTRONIC COMMUNICATION PRIVACY ACT, 18 U.S.C. §2510, ET SEQ. <br> 2. VIOLATIONS OF CALIFORNIA INVASION OF PRIVACY ACT, CAL. PENAL CODE § 631 <br> 3. VIOLATION OF CALIFORNIA INVASION OF PRIVACY ACT, CAL. PENAL CODE § 632 <br> 4. VIOLATIONS OF CONFIDENTIALITY OF MEDICAL INFORMATION ACT, CAL. CIV. CODE §§ 56.06, 56.10, 56.101, 56.36 <br> 5. VIOLATIONS OF CALIFORNIA CONSUMER PRIVACY ACT CAL. CIV. |

1

CLASS ACTION COMPLAINT

CODE § 1798.100(A) AND (B)
6. VIOLATIONS OF CALIFORNIA CONSUMER PRIVACY ACT, CAL. CIV. CODE § 1798.100(C)
7. VIOLATIONS OF CALIFORNIA CONSUMER PRIVACY ACT, CAL. CIV. CODE § 1798.150
8. UNJUST ENRICHMENT

**DEMAND FOR JURY TRIAL**

2

CLASS ACTION COMPLAINT

Plaintiff John Avots-Smith, individually and on behalf of all others similarly situated ("Plaintiff"), brings this class action lawsuit against Thrive Heath Group, Inc., d/b/a Fridays ("Fridays" or "Defendant") and alleges, upon personal knowledge as to their own actions and their counsel's investigation and upon information and good faith belief as to all other matters, as follows:

**NATURE OF THE ACTION**

1. This class action lawsuit addresses Defendant's improper, unauthorized, and illegal disclosure of users' personally identifiable information ("PII") and/or protected health information ("PHI") (collectively referred to as "PII and PHI") to third-party advertising platforms and data analytics companies without those users' knowledge or consent.

2. The market for glucagon-like peptide-1 (GLP-1) medications has experienced explosive growth in recent years, with approximately 20 million Americans using drugs like Wegovy, Ozempic, Mounjaro, and Zepbound for weight loss and diabetes management.[1]

3. Defendant is a participant in this market, serving as an online platform for GLP-1 prescription services to patients across the United States.

4. Defendant owns, maintains, and controls the web domains www.joinfridays.com, www.fridaysfitness.com , and app.joinfridays.com, along with related properties and subdomains (collectively the "Website"). Through the Website, users solicit telehealth services and health products, especially prescriptions of GLP-1 medications.

5. Whereas the Website purports to be no more than a healthcare platform, it

---

[1] Gabby Landsverk, *A Guide to Navigating the Wild West of the Online GLP-1 Market,* MEN'S HEALTH (July 2, 2025), https://www.menshealth.com/health/a65013285/online-glp-1-market/ (last visited Nov. 3, 2025).

CLASS ACTION COMPLAINT

is in reality Defendant's conduit to capture and transmit the PII and PHI of Website visitors and customers to third-party marketers. Through trackers embedded on the Website, and especially in the intake quiz section where users enter their sensitive health information including weight statistics and health conditions, third-party marketing companies collect user data including PII and PHI.

6. Medical data like this PHI is among the most valuable commodities in the digital economy. Industry analysts estimate that the global healthcare data market exceeded $34 billion in 2022 and is projected to reach $105 billion by 2030, representing a compound annual growth rate of over 15%.[2]

7. Individual health records command premium prices in both legitimate and illicit markets, valued as much as fifty times more than credit card information due to their comprehensive nature and permanence.[3]

8. Third-party data brokers are particularly interested in this data, which they use to create detailed psychographic profiles for targeted advertisements and predictive modeling, and which can be sold and resold to advertisers, social media companies, or hackers who may use this data to orchestrate social engineering attacks.[4]

9. As a healthcare provider handling sensitive medical information, Defendant has an obligation not to disclose this data without the consent of those who provided it, and to protect the privacy and confidentiality of PII and PHI in its possession, custody or control.

---

[2] *Healthcare Analytics Market To Reach $167.0 Billion By 2030*, https://www.grandviewresearch.com/press-release/global-healthcare-analytics-market (last visited Nov. 3, 2025).

[3] Herjavec Group, *2021-2022 Healthcare Cybersecurity Report*, https://3447277.fs1.hubspotusercontent-na1.net/hubfs/3447277/2021-Healthcare-Cybersecurity-Report.pdf (last visited Nov. 3, 2025).

[4] *Id.*

CLASS ACTION COMPLAINT

10. This obligation is not merely ethical–it is mandated by federal and state law, including the Health Insurance Portability and Accountability Act of 1996 ("HIPAA").

11. Despite these obligations, Defendant has systematically violated its users' privacy rights by using tracking technologies in its Website that capture and transmit PII and PHI to third parties for marketing and analytics purposes including, but not limited to, selling PII and PHI to advertisers, profiling users without their knowledge, targeting users with advertisements based on their medical conditions, and other improper uses of PII and PHI.

12. These disclosures occur without Website users' knowledge, consent, or authorization, in direct violation of federal and state privacy laws.

13. The unauthorized disclosure of medical information is a fundamental breach of trust in any relationship between one party seeking care and another purporting to offer it.

14. When users seek medical care through the Website, they reasonably expect that their sensitive health information–including health conditions, prescription medications, and medical histories–will remain confidential between them and their healthcare providers.

15. Instead, this information has been shared with technology companies and data brokers who use it for their own commercial purposes.

16. This action seeks redress against Defendant for its unlawful practices and to obtain relief for Plaintiff and other affected parties whose privacy rights have been violated through the unauthorized collection and disclosure of their PII and PHI.

17. Plaintiff brings this action on behalf of himself and the putative Classes defined below to secure redress for: (i) violations of the Electronic Communications Privacy Act, 18 U.S.C. § 2510, *et seq.*; (ii) violations of the California Invasion of Privacy Act, Cal. Penal Code § 631, (iii) violations of the California Invasion of Privacy

CLASS ACTION COMPLAINT

Act, Cal. Penal Code § 632; (iv) violations of the Confidentiality of Medical Information Act, Cal. Civ. Code §§ 56.06, 56.10, 56.101; (v) violations of the California Consumer Privacy Act, Cal. Civ. Code § 1798.100(a), (vi) violations of the California Consumer Privacy Act, Cal. Civ. Code § 1798.100(c); (vii) violations of the California Consumer Privacy Act, Cal. Civ. Code § 1798.150(a)(1); and (viii) Unjust Enrichment. Plaintiff seeks damages and injunctive relief, including Court-ordered implementation of industry-standard data-privacy controls, regular compliance audits of data-sharing practices, and comprehensive monitoring services to prevent future unauthorized data transmission to third parties.

## PARTIES

18. Plaintiff John Avots-Smith is an adult citizen who lives, and at all relevant times has lived, in Oakland, California and who used the Website in 2024.

19. Defendant is a corporation incorporated and existing under the laws of the State of Delaware with its principal place of business located at 17322 Murphy Ave, Irvine, CA 92614.

## JURISDICTION & VENUE

20. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action lawsuit wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of the class is a citizen of a state different from Defendant.

21. This Court has personal jurisdiction over Defendant because Defendant is headquartered in Irvine, California, and conducts significant operations in this District.

22. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) because Defendant resides in this District. Defendant is a corporation with its principal place of business in Irvine, California, and therefore resides in this judicial District for

CLASS ACTION COMPLAINT

venue purposes under 28 U.S.C. § 1391(c)(2).

## **FACTUAL ALLEGATIONS**

### **I.    DATA TRACKING IN THE TELEHEALTH INDUSTRY**

23.    The market for glucagon-like peptide-1 (GLP-1) medications has experienced explosive growth in recent years, with approximately 20 million Americans using drugs like Wegovy, Ozempic, Mounjaro, and Zepbound for weight loss and diabetes management.[5]

24.    Perhaps not surprisingly then, the market for companies such as Ro, Hims & Hers, Calibrate, Noom, and others that offer virtual prescriptions and access to these medications is extremely competitive.[6]

25.    These telehealth companies rely heavily on digital advertising for customer acquisition, and many of them use website tracking technologies to measure advertising effectiveness and retarget prospective patients.[7]

26.    A December 2022 investigation by journalists at *The Markup* and STAT News examined 50 direct-to-consumer telehealth companies and found that 49 had third-party tracking code with the potential to collect and to share sensitive health data with various ad-tech platforms such as Facebook and Google, among many

---

[5] Gabby Landsverk, *A Guide to Navigating the Wild West of the Online GLP-1 Market,* MEN'S HEALTH (July 2, 2025), https://www.menshealth.com/health/a65013285/online-glp-1-market/ (last visited Nov. 3, 2025).

[6] Katie Palmer, *How Digital Health Companies Are Capitalizing on the GLP-1 Boom*, CNBC (May 25, 2024), https://www.cnbc.com/2024/05/25/digital-health-companies-are-launching-programs-around-glp-1s-.htm (last visited Nov. 3, 2025).

[7] Emily Baumgaertner, *Cerebral, Telehealth Startups Face Privacy Pushback over Ad Models*, STAT NEWS (Mar. 22, 2023), https://www.statnews.com/2023/03/22/cerebral-lawsuit-privacy/ (last visited Nov. 3, 2025).

CLASS ACTION COMPLAINT

others.[8]

27.    On thirteen websites, trackers from Meta, Google, TikTok, and other platforms collected patients' answers to medical intake questions about health conditions, medications, and treatment needs.[9]

28.    On 25 telehealth sites—including those operated by Hims & Hers, Ro, and Thirty Madison—tracking codes informed tech platforms when users added prescription medications to shopping carts or completed treatment subscriptions.[10]

29.    Recognizing the sensitivity of the data shared on telehealth sites and the potential for misuse of this information, federal regulators have aggressively pursued telehealth companies for improper data sharing.

30.    The FTC, for example, has reached major settlements with BetterHelp ($7.8 million for sharing mental health data with Facebook, Snapchat, and Pinterest),[11] GoodRx ($1.5 million for sharing prescription data with Facebook and Google),[12] and Cerebral (affecting 3.1 million patients whose data was shared with

---

[8] Todd Feathers *et al.*, *"Out Of Control": Dozens of Telehealth Startups Sent Sensitive Health Information to Big Tech Companies*, THE MARKUP (Dec. 13, 2022), https://themarkup.org/pixel-hunt/2022/12/13/out-of-control-dozens-of-telehealth-startups-sent-sensitive-health-information-to-big-tech-companies (last visited Nov. 3, 2025).

[9] *Id.*

[10] *Id.*

[11] *Fed. Trade Comm'n, FTC Proposed Order Prohibits BetterHelp from Revealing Consumers' Data, Including Sensitive Mental Health Information, to Facebook and Others* (Mar. 2, 2023), https://www.ftc.gov/news-events/news/press-releases/2023/03/ftc-proposed-order-prohibits-betterhelp-revealing-consumers-data-including-sensitive-mental-health (last visited Nov. 3, 2025).

[12] *Fed. Trade Comm'n, FTC Enforcement Action Bars GoodRx from Sharing Consumers' Sensitive Health Info for Advertising* (Feb. 1, 2023), https://www.ftc.gov/news-events/news/press-releases/2023/02/ftc-enforcement-

CLASS ACTION COMPLAINT

Meta, Google, and TikTok).[13]

31.    In July 2023, the FTC and HHS Office for Civil Rights jointly warned 130 hospital systems and telehealth providers about privacy risks from tracking technologies.[14]

32.    Despite these enforcement actions, telehealth providers continue to extract and sell user data to third parties for advertising purposes, exploiting the popularity of their products and the sensitivity of their customers' needs in order to profit through undisclosed third-party advertising integrations.

33.    Medical and health data is one of the most valuable commodities in the digital economy. Industry analysts estimate that the global healthcare data market exceeded $34 billion in 2022 and is projected to reach $105 billion by 2030, representing a compound annual growth rate of over 15%.[15]

34.    Individual health records command premium prices in both legitimate and illicit markets, valued as much as fifty times more than credit card information due to

---

action-bars-goodrx-sharing-consumers-sensitive-health-info-advertising        (last visited Nov. 3, 2025).

[13] *Pixel Use Results in Impermissible Disclosure of the PHI 3.1 Million Cerebral Platform        Users*,        HIPAA        JOURNAL        (Mar.        13,        2023), https://www.hipaajournal.com/cerebral-impermissible-disclosure-pixel-3170000/ (last visited Nov. 3, 2025).

[14] *Fed. Trade Comm'n, FTC and HHS Warn Hospital Systems and Telehealth Providers About Privacy and Security Risks from Online Tracking Technologies* (July 20, 2023), https://www.ftc.gov/news-events/news/press-releases/2023/07/ftc-hhs-warn-hospital-systems-telehealth-providers-about-privacy-security-risks-online-tracking (last visited Nov. 3, 2025).

[15] *Healthcare Analytics Market To Reach $167.0 Billion By 2030*, https://www.grandviewresearch.com/press-release/global-healthcare-analytics-market (last visited Nov. 3, 2025).

CLASS ACTION COMPLAINT

their comprehensive nature and permanence.[16]

35.    Third-party data brokers that are embedded in health apps and websites are extremely interested in this valuable data, which they use to create detailed psychographic profiles for targeted advertisements and predictive modeling, and which can be sold and resold to advertisers, social media companies, or hackers who may use this data to orchestrate social engineering attacks.[17]

## II. USERS' SENSITIVE INFORMATION, INCLUDING MEDICAL DATA, IS SOLICITED BY AND DIVULGED TO DEFENDANT THROUGH THE WEBSITE.

36.    Defendant owns and operates the Website as a telehealth platform that provide virtual weight loss consultations and prescription services for weight management medications.

37.    Thousands of people rely on Defendant and its services, including the Website, as their primary conduit to weight loss treatment and related health services.

38.    The Website is marketed as offering specialized weight loss programs with access to prescription medications like GLP-1 agonists for weight management solutions.

39.    The Website has achieved significant market penetration in the rapidly growing telehealth weight loss market, capitalizing on demand for GLP-1 medications and other weight loss treatments.

40.    Defendant markets the Website as providing confidential, personalized weight loss solutions and emphasizes the private nature of their healthcare services.

41.    Unlike traditional healthcare providers who collect patient information

---

[16]    Herjavec    Group,    *2021-2022    Healthcare    Cybersecurity    Report*, https://3447277.fs1.hubspotusercontent-na1.net/hubfs/3447277/2021-Healthcare-Cybersecurity-Report.pdf (last visited Nov. 3, 2025).

[17] *Id.*

CLASS ACTION COMPLAINT

after establishing a provider-patient relationship, the Website requires users to submit detailed health information through a comprehensive onboarding quiz before they can create an account, review any privacy policies, or access services.

42.    The Website contains numerous first- and third-party tracking implementations that measure and record user data. These tracking technologies, including web beacons, pixels, and software development kits ("SDKs"), are small pieces of code that developers integrate directly into their websites to track user behavior and transmit data to third-party platforms—in this case, transmitting sensitive health information for advertising and analytics purposes.

43.    Specifically, Defendant has deployed on the Website the Northbeam web tracking technology, Google Analytics and Google DoubleClick tracking technologies, and the TikTok Pixel and Advanced Matching, among other third party tracking tools (collectively, the "Tracking Technology").

44.    By installing and using these tracking technologies, developers—including those who created the Website or have been responsible for their maintenance and updates—embed these companies' technologies enabling comprehensive data collection regarding users' health information, quiz responses, and personal identifiers.

### a. Background on Google Analytics Tracker

45.    Google LLC operates Google Analytics, a leading web analytics service that website owners use to understand user behavior, measure traffic, and optimize site performance.

46.    Google encourages businesses and website owners to use Google Analytics to gather insights about user interactions, such as page views, session duration, and conversions, which can be leveraged for advertising and other marketing activities.

47.    Google Analytics functions as a sophisticated advertising intelligence platform. Advertisers use Google Analytics to build remarketing lists of users who

11

CLASS ACTION COMPLAINT

visited specific pages, track conversion paths from initial ad exposure through final purchase, create "lookalike audiences" of potential customers, and export user segments directly to Google Ads for immediate targeting. Google's own documentation confirms that "[a]nalytics audiences can be shared with Google Ads to create remarketing campaigns."[18]

48.    Central to Google Analytics is a snippet of code (commonly referred to as the Global Site Tag ("gtag.js") or Google Analytics tag) that, once embedded, enables the tracking of website visitors' actions and the collection of related data.[19]

49.    According to Google's documentation, this snippet helps determine when users perform key actions—e.g., viewing a page, clicking a link, or making a purchase—so that site owners can accurately measure engagement and conversions.[20]

50.    This data is transmitted alongside a user's including Google Client IDs ("CID"), an unique numeric string which specifically identifies a Google user.

51.    The CID is a persistent identifier that can be linked to specific individuals across apps, browsers, and devices and helps businesses understand user engagement and identify trends.

52.    When a user accesses a webpage containing Google Analytics code,

[18] Google Analytics Help, Activate Google Analytics audiences in Google Ads, https://support.google.com/analytics/answer/3450482 (last visited Dec. 16, 2025).

[19]    *Get    Started    with    Google    Tag* https://support.google.com/analytics/topic/12403939?hl=en&ref_topic=14088998 &sjid=12500510714154886837-NC (last visited Dec. 16, 2025).

[20] *About events*, https://support.google.com/analytics/answer/1033068 (last visited Dec. 16, 2025).

CLASS ACTION COMPLAINT

their interaction data may be transmitted to Google's servers in real time. This data transmission does not occur unless the Google Analytics tag is deliberately installed on the webpage. Moreover, site owners retain control over which events are tracked and how data is configured in their settings.[21]

53.    The process of setting up Google Analytics is multi-step and must be initiated by the website owner, including creating a property within Google Analytics, placing the tracking code on the website, and configuring data-sharing settings.[22]

54.    Google explains that implementing Google Analytics enables site owners to "measure your advertising ROI as well as track your Flash, video, and social networking sites and applications."[23]

55.    As part of the Google Analytics Terms of Service, website owners must comply with applicable privacy laws and are responsible for disclosing the use of Google Analytics to their end users, including obtaining any necessary consents.[24]

56.    Therefore, any information collected in violation of Google's policies or the site owner's legal obligations, would be transmitted only if the site owner

---

[21] *Id.*

[22] *Set up Analytics for a Website*, https://support.google.com/analytics/answer/9304153 (last visited Dec. 16, 2025).

[23] *Google Universal Analytics*, https://exchange.adobe.com/apps/ec/102829/google-universal-analytics (last visited Dec. 16, 2025).

[24] *Data Privacy and Security*, https://support.google.com/analytics/topic/2919631?hl=en&ref_topic=1008008,3544742,2986333,&sjid=12500510714154886837-NC (last visited Dec. 16, 2025).

CLASS ACTION COMPLAINT

chose to implement and configure Google Analytics in such a manner.[25]

57.    Google places responsibility on website owners to ensure they have provided sufficient notice to users and obtained appropriate consent where required. Google's documentation and policy framework stress transparency and legal compliance with data collection and usage.[26]

58.    The other major marketing tool in the Google suite is Google DoubleClick, a comprehensive advertising technology platform that features a real-time bidding system where advertisers bid on individual users in milliseconds based on their profiles, follow users across devices to create unified profiles, show dynamic ads featuring exact products or services previously viewed, and target users based on inferred interests across millions of websites.

59.    The transmission of data to Google DoubleClick is particularly revealing. DoubleClick is not an analytics tool–it is Google's dedicated advertising technology platform designed specifically to:

a.    Build comprehensive user profiles across websites;

b.    Enable behavioral targeting and retargeting;

c.    Facilitate real-time bidding for advertising inventory;

d.    Track conversions and attribute sales to specific ads;

e.    Create "lookalike audiences" for expanded targeting.[27]

60.    Google's advertising tools, including the Tracking Technologies, are implemented by embedding a specialized JavaScript snippet into a website or

---

[25]    *Personal Data and Google Analytics*, https://support.google.com/analytics/answer/7667196 (last visited Dec. 16, 2025).

[26] *Id.*

[27]    *About Audience Segments*, https://support.google.com/google-ads/answer/2497941?hl=en (last visited Dec. 16, 2025).

CLASS ACTION COMPLAINT

smartphone app's source code. They are automatically activated upon a user's arrival. These snippets are designed to initialize a comprehensive data collection mechanism that begins logging user interactions immediately as the webpage loads.

61.    Once activated, these Tracking Technologies capture a wide range of user inputs and behaviors. They record keystrokes, mouse movements, clicks, scrolling behavior, and even time spent on specific portions of a page. Every interaction, whether it involves entering data into form fields or simply navigating between pages, may be documented.

62.    The captured data is then automatically transmitted in real time to remote servers, effectively duplicating all electronic communications that take place between the user and the website. The data transmitted in these contexts often includes sensitive personal information such as login credentials, contact details, browsing data, and other confidential information.

63.    The continuous transmission of detailed user interaction data creates a comprehensive record of the user's online behavior. This practice involves the interception and storage of Sensitive Information and other confidential communications.

64.    Google uses these Tracking Technologies to monetize user data. Google's SEC filings states: "We generate revenues primarily by delivering relevant, cost-effective online advertising."[28]

65.    By using the Tracking Technologies, advertisers can specifically target users based on their revealed behaviors. Pet product companies, for example, may

---

[28] Alphabet Inc., Annual Report (Form 10-K) at 10 (Feb. 2, 2025), https://abc.xyz/assets/59/ff/66de11a3bfa7db6cb929ba12a01b/6b3f31ad08de72f11d32f2b4f712b918.pdf (last visited Dec. 16, 2025).

15

CLASS ACTION COMPLAINT

identify active pet owners, travel service providers target users who book pet care before trips, and insurance companies leverage behavioral data to identify and market to specific risk profiles. This targeting extends across Google's entire advertising network, following users wherever they browse online.[29]

66.    Every time a user navigates the Website, the Tracking Technologies initialize automatically and transmit granular event data—including each page or screen visited, data and terms entered, device identifiers, and the CID uniquely assigned to that user—to Google-controlled servers.

67.    As a result, third-party marketing and analytics companies learn—and can permanently store—highly specific details about users' personal data and behavior. Here, this means that the Tracking Technologies transmit Website users' prospective transactions from the moment those users enter the Website.

### b. Background on Northbeam's Tracking Pixel

68.    The Website includes web tracking technology developed by Northbeam, a company that provides advertising and analytics technologies to companies across the internet ecosystem. The Northbeam web tracking technology, as implemented on the Website, records and transmits the personal information that a user enters in the quiz such as their full name, email, and phone number.

69.    This means Northbeam collects all quiz responses including weight data, medical histories, past surgeries, health conditions, and medications, along with users' names, email addresses, and phone numbers.

70.    Northbeam is a marketing intelligence platform that provides ecommerce and direct-to-consumer brands with attribution analytics and customer

---

[29] Englehardt & Narayanan, Online Tracking: A 1-million-site Measurement and Analysis, Proceedings of the 2016 ACM SIGSAC Conference 1388, 1396 (2016), https://www.cs.princeton.edu/~arvindn/publications/OpenWPM_1_million_site_tracking_measurement.pdf (last visited Dec. 16, 2025).

CLASS ACTION COMPLAINT

journey tracking.[30] The Northbeam platform operates the Northbeam web tracking technology which Northbeam instructs its business customers to deploy on every page of their websites.[31] Northbeam describes its SDK as "a snippet of code that allows Northbeam to collect important behavioral information about your website visitors."[32]

71.    The Northbeam web tracking technology is loaded asynchronously from Northbeam's servers at "j.northbeam.io" using a unique client identifier assigned to each website operator.[33] When a visitor loads a webpage containing the Northbeam web tracking technology, the JavaScript code executes in the visitor's browser and begins collecting data about the visitor's browsing behavior and interactions.

72.    Northbeam instructs website operators to configure a DNS A-Record that creates a subdomain (typically "i") pointing to Northbeam's servers.[34] As Northbeam explains, "This simple step enables first-party tracking using your domain, unlocking advanced tracking capabilities while avoiding many of the

---

[30] *What is Pixel Tracking?*, https://www.northbeam.io/blog/what-is-pixel-tracking (last visited Dec. 3, 2025).

[31] *Id.*

[32] *Add Pixel*, https://docs.northbeam.io/docs/add-pixel (last visited Dec. 3, 2025).

[33] *All Other Platforms Installation*, https://docs.northbeam.io/docs/non-shopify-installation (last visited Dec. 3, 2025).

[34] *Link DNS*, https://docs.northbeam.io/docs/link-dns (last visited Dec. 3, 2025).

17

CLASS ACTION COMPLAINT

limitations of third-party tracking."[35]

73.    Through this subdomain configuration, Northbeam sets first-party cookies on visitors' browsers that store user data and tracking information.[36] Northbeam states that "First-party cookies store user data, and pixel events are sent securely to your Northbeam dashboard."[37] This configuration allows Northbeam to track returning visitors and link their browsing sessions across multiple visits to the website.

74.    Northbeam provides website operators with JavaScript methods to identify individual visitors and link their browsing activity to PII. The *identify()* method "Identifies the current user with a particular real-world identifier" and "[b]etter enables Northbeam to understand cross-device activity."[38] This method currently works with email addresses to link a visitor's browsing behavior to their identity.[39]

75.    Northbeam also offers an *identifyCustomerId()* method that "Identifies the current user with an ID from your Order Management System (OMS)" to "help[]

---

[35] *Id.*

[36]*Northbeam's Data Sources*, https://docs.northbeam.io/docs/northbeam-data-sources (last visited Dec. 3, 2025).

[37] *Id.*

[38]*(Optional) Additional Events*, https://docs.northbeam.io/docs/optional-additional-methods (last visited Dec. 3, 2025).

[39] *Id.*

18

CLASS ACTION COMPLAINT

Northbeam track cross-device behavior more accurately."[40] This method enables Northbeam to correlate website browsing activity with customer records in the website operator's backend systems.

76.    The *fireEmailCaptureEvent()* method "[s]ends an event to Northbeam indicating that a user has signed up for something with their email address."[41] Northbeam documentation states that "if you fire an email capture event, there is no need to call identify - fireEmailCaptureEvent implicitly does an identify() call in the backend."[42] This means that whenever a visitor submits their email address through a form on a website using Northbeam, their email is automatically transmitted to Northbeam and linked to their browsing history.

77.    Northbeam enables website operators to track custom events and goals through the *fireCustomGoal()* method, which "[s]ends an event to Northbeam indicating that a custom goal has happened."[43] Examples of custom goals include "custom quote form fills," "SMS signups," and "add-to-cart events," allowing comprehensive tracking of visitor interactions throughout the website.

78.    Northbeam's *firePurchaseEvent()* method captures detailed transaction data when a visitor completes a purchase.[44]  The purchase event transmits extensive

---

[40] *Id.*

[41] *Sign Up Events*, https://docs.northbeam.io/docs/setting-up-email-signups (last visited Dec. 3, 2025).

[42] *(Optional) Additional Events*, supra n. 38.

[43]*Id.*

[44]*Add client-side purchase tracking*, https://docs.northbeam.io/docs/add-client-side-purchase-tracking (last visited Dec. 3, 2025).

CLASS ACTION COMPLAINT

order information to Northbeam, including: the order ID, total price, shipping price, tax amount, coupon codes used, currency, and detailed line item information for each product purchased (including product ID, variant ID, product name, variant name, price, and quantity).[45]

79.    Northbeam tracks visitor sessions and customer journeys through its proprietary system. A "Visit" in Northbeam "typically marks the beginning of a session, which is defined as a period of continuous activity on the site" that "generally ends after 30 minutes of inactivity."[46] Northbeam's system identifies mid-session ad clicks through platform-specific click ID parameters in URLs, including gclid (Google Ads), fbclid (Meta Ads), msclkid (Microsoft Ads), ttclid (TikTok Ads), aleid (AppLovin), epik (Pinterest Ads), and ScCid (Snapchat Ads).[47]

80.    Northbeam combines all these and other data through what it calls a "Device Graph" that aggregates data from multiple sources to create comprehensive profiles of individual visitors.[48] Northbeam uses "world-class Machine Learning models to accurately stitch users across sessions through a bespoke identity and

---

[45]*Id.*

[46]*Differences in Visits and Journeys*, https://docs.northbeam.io/docs/differences-in-visits (last visited Dec. 3, 2025).

[47]*Id.*

[48] *Northbeam Metrics 101*, https://docs.northbeam.io/docs/northbeam-metrics-101 (last visited Dec. 3, 2025).

CLASS ACTION COMPLAINT

device graph."[49]  This enables Northbeam to track individual users across different devices, browsers, and sessions, creating a unified profile of each visitor's complete browsing and purchasing history.

81.     Northbeam emphasizes that its tracking system is built on first-party data collection.  Northbeam states that "[t]he core of Northbeam's MTA tracking solution uses a first-party cookie from your website" and that it "leverage[s] only first-party data to resolve customer identities."[50]  This first-party data approach allows Northbeam's tracking to persist despite browser restrictions on third-party cookies and other privacy protections.

82.     Northbeam collects and processes visitor data to provide its business customers with marketing attribution and customer journey analytics.   The information collected includes behavioral data such as marketing touchpoints, pages visited, session duration, and conversion events.[51]  This data is combined with PII—including email addresses and unique customer IDs—to create detailed profiles of visitors that persist across multiple browsing sessions and devices.

### c. Background on ByteDance, Ltd.'s TikTok Analytics Pixel

83.     ByteDance, Ltd. operates TikTok, one of the world's largest social media companies, which generated approximately $8 billion in revenue from the

---

[49] *Northbeam, Unlocking Growth With Dependable Data & Clear Customer Journeys: KITSCH,* https://www.northbeam.io/case-study/unlocking-growth-with-dependable-data-clear-customer-journeys-kitsch (last visited Dec. 3, 2025).

[50]*How Will Cookie Deprecation Affect Northbeam? An Explainer*, https://www.northbeam.io/blog/how-will-cookie-deprecation-affect-northbeam-an-explainer (last visited Dec. 3, 2025).

[51] *Id.*

CLASS ACTION COMPLAINT

United States in 2024, the majority of which was derived from selling advertising space.[52]

84. TikTok provides various "TikTok Business Products," enabling businesses and website owners to measure advertising performance, optimize campaigns, and reach target audiences.[53]

85. Among these products is the "TikTok Pixel," a snippet of code that can be embedded in webpages or mobile applications to collect and transmit information about user interactions for analytics and ad targeting.[54]

86. TikTok's documentation indicates that the TikTok Pixel can detect and report specific user actions such as page views and purchases, thereby assisting advertisers in measuring conversions and user engagement.[55]

87. The TikTok Pixel can also capture identifiable user data that identifies individual users and tracks their browsing behavior across various websites.[56]

88. When a user accesses a webpage equipped with the TikTok Pixel, data regarding the user's interaction with that page may be transmitted to TikTok's

---

[52] *TikTok Ad Revenue Worldwide, 2020-2027*, STATISTA, https://www.statista.com/statistics/1305708/tiktok-ad-revenue/ (Last visited Dec. 16, 2025).

[53] *TikTok for Business*, https://ads.tiktok.com/business/ (Last visited Dec. 16, 2025).

[54] *See TikTok Pixel, TikTok Help Center*, https://ads.tiktok.com/help/article/tiktok-pixel-1600947004383233 (last visited Dec. 16, 2025).

[55] *TikTok Pixel & SDK, TikTok Developers*, https://developers.tiktok.com/doc/ios-ads-tiktok-pixel/ (last visited Dec. 16, 2025).

[56] *Report App Web, Offline, or CRM Events*, https://business-api.tiktok.com/portal/docs?id=1771101303285761 (last visited Dec. 16, 2025).

22

CLASS ACTION COMPLAINT

servers in real time for analysis and ad targeting purposes.[57]

89.   Notably, data transmission occurs only if the Pixel has been intentionally installed on a webpage. The website owner can configure which user actions are tracked and shared with TikTok.[58]

90.   TikTok offers a feature called "Advanced Matching," which is designed to improve ad targeting and measurement by matching website visitors to their TikTok user accounts.[59] Advanced Matching works by collecting personal identifiable information from website visitors—such as email addresses, phone numbers, and names—and transmitting this data to TikTok in hashed format.[60]

91.   When Advanced Matching is enabled, the TikTok Pixel automatically captures user information entered into website forms or stored in the website's code, hashes this information using the SHA-256 cryptographic algorithm, and transmits the hashed values to TikTok's servers.[61] TikTok then compares these hashed values against its database of TikTok user information to identify matches.[62]

[57] *TikTok Privacy Policy*, https://www.tiktok.com/legal/privacy-policy (last visited Dec. 16, 2025).

[58] *TikTok Business Products Terms*, https://www.tiktok.com/legal/tiktok-for-business-terms (last visited Dec. 16, 2025).

[59] *Advanced Matching*, https://ads.tiktok.com/help/article/advanced-matching (last visited Dec. 16, 2025).

[60] *Set Up Advanced Matching for TikTok Pixel*, https://ads.tiktok.com/help/article/set-up-advanced-matching-tiktok-pixel (last visited Dec. 16, 2025); *see also Events API*, https://business-api.tiktok.com/portal/docs?id=1771100865818625 (last visited Dec. 16, 2025) (describing automatic hashing of customer information parameters).

[61] *SHA-256 Algorithm*, https://business-api.tiktok.com/portal/docs?id=1771101027431425 (last visited Dec. 16, 2025).

[62] *Understanding TikTok's Events API: Advanced Matching*, https://business-api.tiktok.com/portal/docs?id=1771100890134530 (last visited Dec. 16, 2025); *see*

23

CLASS ACTION COMPLAINT

92.    This process enables TikTok to link a user's anonymous browsing activity on a website to their identified TikTok account, thereby allowing TikTok to attribute specific website behaviors—including viewing health-related content or completing sensitive questionnaires—to known individuals.[63] The hashing process does not anonymize the data; rather, it enables TikTok to match website visitors to their existing user profiles while obscuring the data in transit.[64]

93.    Through Advanced Matching, TikTok can receive and store associations between users' personal identifiers (email addresses, phone numbers) and their browsing behavior, including the specific URLs they visit and the content they view, even if users are not logged into TikTok or do not have the TikTok app installed on their devices.[65]

94.    Implementation of the Pixel requires the website owner to follow a multi-step process that includes integrating TikTok-provided code and defining the

---

*also Improve Performance with Advanced Matching*, https://ads.tiktok.com/help/article/improve-performance-advanced-matching (last visited Dec. 16, 2025) ("[Advanced Matching] helps us better attribute your conversions and find more people similar to those converting on your website").

[63] *Advanced Matching*, supra n. 59.

[64] *User Privacy and Advanced Matching*, https://ads.tiktok.com/help/article/user-privacy-advanced-matching (last visited Dec. 16, 2025); *see also Events API Overview*, https://business-api.tiktok.com/portal/docs?id=1771101130094593 (last visited Dec. 16, 2025) ("Personal information is hashed on the client side before being sent to TikTok's servers, where it is used to match users to their TikTok profiles.").

[65] *Advanced Matching Parameters*, https://business-api.tiktok.com/portal/docs?id=1771101204244481 (last visited Dec. 16, 2025); *TikTok Pixel Advanced Matching Setup*, https://ads.tiktok.com/help/article/advanced-matching-setup (last visited Dec. 16, 2025).

24

CLASS ACTION COMPLAINT

events to be tracked.[66]

95.    TikTok states that using the Pixel helps website owners "measure traffic on your website, measure ad campaign performance, optimize campaigns, and find new customers."[67]

96.    As part of setting up the Pixel, website owners must agree to TikTok's Business Products Terms, under which owners affirm they have obtained any required user permissions or consents before transmitting data to TikTok.[68]

97.    Consequently, any PII and PHI is only disclosed to TikTok if the website owner has lawful authority under applicable statutes and regulations.

98.    TikTok's policy framework places the onus on website owners to ensure they comply with legal obligations, including providing sufficient notice to users, obtaining requisite consents, and implementing the Pixel only in compliance with relevant privacy laws.

**III. WEBSITE USERS' PII AND PHI IS INTERCEPTED BY THE WEBSITE'S TRACKING TECHNOLOGY WITHOUT CONSENT.**

99.    Defendant maintains and owns the Website and has made the conscious and intentional decision to install the Tracking Technology on the Website, thereby allowing the providers of the Tracking Technology and other third-party trackers that may be present on the Website, to intercept and to collect all user interactions—

---

[66] *TikTok Business Help Center*, TikTok, https://ads.tiktok.com/help?language=en (last visited Dec. 16, 2025).

[67] *TikTok Pixel & SDK*, *supra* n.55.

[68]*TikTok Business Products*, https://ads.tiktok.com/i18n/official/policy/business-products-terms.

25

CLASS ACTION COMPLAINT

including responses to sensitive health screening questions—in real-time.

100.   Individuals who visit the Website are not immediately presented with the option to create an account and do not pass a link to any terms of use, privacy policy or any other page where tracking activities are disclosed.



101.   Rather, upon accessing the Website, the user is presented with buttons inducing them to "Get Your Custom Plan" or "Get Started." Both buttons lead the user to an onboarding assessment quiz before they have an opportunity to review any terms of service or privacy policy.

26

CLASS ACTION COMPLAINT





102.   Users are directed to a survey through which they are required to answer questions on sensitive health topics and to provide PII like their names and

27

email addresses. Examples of the questions asked in the quiz are reproduced below.

103.   Users are also asked to input their email and phone number before completing the quiz.

104.   The Tracking Technology is active on every page throughout the quiz and subsequent onboarding pages and is set up to capture user interactions and transmit this data to at least Northbeam, Google, and TikTok.

105.   The Google Analytics tracker captures and transmits to Google each specific URL the user visits as he progresses through the quiz and subsequent onboarding pages, along with the user's personally identifiable CID.

dma: 0
cid: 1283621066.1763584023
ul: en-us
sr: 1920x1080
ir: 1
frm: 0
pscdl: noapi
_eu: EAAAAAQ
_s: 6
tag_exp: 103116026~103200004~104527906~104528501~104684208~104684211~105391253~115583767~115616985~115
sid: 1765336592
sct: 5
seg: 1
dl: https://app.joinfridays.com/onboarding/warm-up/bmi
dr: https://app.joinfridays.com/onboarding/choose-plan
dt: Fridays Health
en: general_click
ep.lp_utm_source: google
ep.lp_utm_medium: cpc
ep.lp_utm_campaign: Branded
ep.lp_utm_content: 752359749008
ep.lp_utm_term
ep.lp_first_page_referrer: https://www.joinfridays.com/
ep.lp_fbclid
ep.lp_gclid
ep.click_text: Tell us about yourself (*) Mandatory field Height (feet) Height (inches) Weight (pounds) Your BMI Score is 48.3
ep.click_url

106.   The Google Analytics tracker also captures and transmits to Google the

28

CLASS ACTION COMPLAINT

user's BMI when the user submits this information to Defendant through the Website.

107.    As constructed on the Website, Northbeam's web tracking technology also captures and transmits page names, the text and format of the page, and user clicks and interactions with the page and its contents. In the context of the quiz, where answers are provided by clicking certain elements on the page, clicks correspond to answers to sensitive questions. Through recording user clicks on these pages, Northbeam intercepts users' answers to these questions.

108.    Northbeam's web tracking technology also captures and stores user identities entered on the Website through features like "EmailCaptureEvent" and "identifyCustomerId" which transmit PII to Northbeam.



*The Northbeam web tracking technology, which is active on every quiz page on the Website*

CLASS ACTION COMPLAINT

```
function init(config, bundle) {
    clientConfig = config;
    var LegacyNorthbeamAsAnObject = {
            identify: identify_1.identify,
            identifyCustomerId: identifyCustomerId_1.identifyCustomerId,
            trackPageView: trackPageView_1.trackPageView,
            fireEmailCaptureEvent: fireEmailCaptureEvent_1.fireEmailCaptureEvent,
            fireCustomGoal: fireCustomGoal_1.fireCustomGoal,
            firePurchaseEvent: firePurchaseEvent_1.firePurchaseEvent,
            fireSlimPurchaseEvent: fireSlimPurchaseEvent_1.fireSlimPurchaseEvent
        },
        NorthbeamPublicFunctions = {
            identify: identify_1.identify,
            identifyCustomerId: identifyCustomerId_1.identifyCustomerId,
            trackPageView: trackPageView_1.trackPageView,
            fireEmailCaptureEvent: fireEmailCaptureEvent_1.fireEmailCaptureEvent,
            fireCustomGoal: fireCustomGoal_1.fireCustomGoal,
            firePurchaseEvent: firePurchaseEvent_1.firePurchaseEvent,
            fireSlimPurchaseEvent: fireSlimPurchaseEvent_1.fireSlimPurchaseEvent
        },
```

*Events set up in the Northbeam web tracking technology including the
"identifyCustomerID" and "EmailCaptureEvent"*

```
        },
        addClickListeners: function() {
            var e,
                n,
                r = document.links;
            for (e = 0; e < r.length; e++)
                o(r[e]) && !r[e][t] && (n = r[e], i ? (a.addEventListener(n, "mouseup", p(s), !1), a.addEventListener(n,
"mousedown", p(s), !1)) : a.addEventListener(n, "click", p(s), !1), r[e][t] = !0)
            }
        }
    }
}, {
    "./lib/helpers": 292,
    "lodash/isUndefined": 268
}],
```

*Click tracking events set up within the Northbeam web tracking technology*

30

CLASS ACTION COMPLAINT

```
;
if (!window[window["TiktokAnalyticsObject"]]._server_unique_id)
    window[window["TiktokAnalyticsObject"]]._server_unique_id = '10133b1e-d57d-11f0-8cbb-76c7f352fb96';
window[window["TiktokAnalyticsObject"]]._plugins = {
    "AdvancedMatching": true,
    "AutoAdvancedMatching": true,
    "AutoClick": true,
    "AutoConfig": true,
    "Callback": true,
    "DiagnosticsConsole": true,
    "EnableLPV": true,
    "EnrichIpv6": true,
    "EnrichIpv6V2": true,
    "EventBuilder": true,
    "EventBuilderRuleEngine": false,
    "HistoryObserver": true,
    "Identify": true,
    "JSBridge": false,
    "Metadata": true,
    "Monitor": true,
    "PageData": true,
    "PerformanceInteraction": false,
    "RuntimeMeasurement": true,
    "Shopify": true,
    "WebFL": false
```

*TikTok's Advanced Matching, which recognizes, captures, and transmits to TikTok personally identifiable user information and other user inputs.*

109. The TikTok Advanced Matching pixel is also set up to capture user text inputs and activity, including clicks, on every page of the intake quiz.

110. As the screenshots above show, these pixels capture the sensitive health information and unique identifiers that users provide through the quiz process and transmit this data to third parties including Google, Northbeam, and TikTok. Therefore, individuals who take the quiz are tracked and uniquely identified through the third parties' capture of their identifying characteristics like full name and email address, as well as through methods of identifying users like the Northbeam "Device Graph" profiling.

111. At no point in the quiz process is the user presented with any disclosure, either explicit or constructive, that Tracking Technology is present on every page of the quiz to capture answers to these highly sensitive questions, or that any web tracking tool collects user data to create personalized, identifiable profiles combining the sensitive data entered on the Website with users' broader web browsing activity.

31

CLASS ACTION COMPLAINT

## IV.    REPRESENTATIVE PLAINTIFF'S EXPERIENCE.

112.    Plaintiff John Avots-Smith currently resides (and all times herein relevant has resided) in Oakland, California.

113.    In or about February 2024, while living and physically present in California, Plaintiff accessed the Website to search for GLP-1 treatment options.

114.    During this visit, Plaintiff completed the initial quiz process, which required him to disclose to Defendant answers to sensitive questions related to health and medical history. Specifically, Plaintiff disclosed his weight and height, the fact that he was accessing the Website with the intention to obtain a prescription for GLP-1 medication, his eligibility to receive GLP-1 treatment based on his answers to the intake quiz, and his enrollment in Defendant's "GLP-1 Weight Loss" program which includes a prescription for, and use of, GLP-1 prescription medication.

115.    As a result of Plaintiff completing the quiz, Defendant disclosed to third parties including Northbeam, TikTok, and Google, the information he disclosed to Defendant through the initial quiz process

116.    In addition to disclosing his eligibility for GLP-1 services and his seeking a prescription for GLP-1 medication, Defendant intercepted at least the following communications about Plaintiff's patient status, the prescription medication he was seeking, and his purchase of the GLP-1 prescription medication, via long-URLs or substantially similar URLs that were sent to including Northbeam, TikTok, and Google:

    a.  https://app.joinfridays.com/onboarding/choose-treatment

    b.  https://app.joinfridays.com/onboarding/checkout

117.    At no point before or during this process was Plaintiff provided with any notice or means to consent (*i.e.*, a link to Defendant's terms of use or privacy policy) to his answers being recorded. Nor was he provided with any notice that this recording was taking place.

118.    Plaintiff did not click on, view, or otherwise access any hyperlinks to

32

CLASS ACTION COMPLAINT

Defendant's terms of use, privacy policy, or any similar page during the visit.

119. Plaintiff had not checked any box, clicked any button, or taken any other affirmative action indicating consent to have his data captured by the Tracking Technology present on every page of the quiz, or to have his communications intercepted by third parties when he took the quiz.

120. Plaintiff was unaware at the time that his information was being captured in real time by the Tracking Technology present on every page of the quiz and disclosed to Northbeam, Google, and TikTok, which collect user data from across the web to create personalized, identifiable profiles combining the sensitive data entered on the Website with users' web browsing activity.

121. Had he known that Defendant was using the Tracking Technology on every page of the quiz to capture his answers to sensitive questions, and that Northbeam, Google, and TikTok collect user data from across the web to create personalized, identifiable profiles combining the sensitive data entered on the Website with his web browsing activity, Plaintiff would not have used the Website or would have limited the information provided.

122. By allowing the surreptitious recording and distribution to third parties of Plaintiff's sensitive weight-related data and prescription information through the initial quiz, Defendant facilitated the nonconsensual transmission of Plaintiff's HIPAA-protected health information to third parties, violating Plaintiff's legally protected privacy interests in his sensitive medical information.

123. As a result of Defendant's conduct, Plaintiff's privacy rights were violated, and Plaintiff suffered harm in the form of loss of control over his private health data, increased anxiety due to unknown parties accessing sensitive data, loss of the benefit of the bargain in keeping or exchanging his private data, and other harms related to the undisclosed and non-consenting transmission of PHI and PII.

**CLASS ACTION ALLEGATIONS**

33

CLASS ACTION COMPLAINT

124. Plaintiff, on behalf of himself and all others similarly situated, seeks relief under Federal Rule of Civil Procedure 23 on behalf of the following class and subclass (together the "Classes"):

**The Nationwide Class:**
> All individuals who used the Website and had their personal information or medical information collected, disclosed, or transmitted to third parties without their knowledge or consent.

**The California Subclass:**
> All individuals who, while residing in California, used the Website and had their personal information or medical information collected, disclosed, or transmitted to third parties without their knowledge or consent.

125. The following people are excluded from the Class and Subclass: (i) any judge or magistrate presiding over this action and members of their families; (ii) Defendant, Defendant's subsidiaries, parents, successors, predecessors, affiliated entities, and any entity in which Defendant or its parent has a controlling interest, and their current or former officers and directors; (iii) persons who properly execute and file a timely request for exclusion from the Class or Subclass; (iv) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (v) Plaintiff's counsel and Defendant's counsel; and (vi) the legal representatives, successors, and assigns of any such excluded persons.

126. Plaintiff reserves the right to revise or amend the Class definitions based on the discovery of new information.

127. **Numerosity:** The exact number of members of the Classes is unknown but, upon information and good faith belief, it is estimated to number in the hundreds of thousands, and individual joinder of these claims is therefore wholly impracticable. Members of the Classes can be readily identified through Defendant's records and objective criteria, and notice can be provided through techniques similar to those customarily used in other class action lawsuits.

128. **Typicality:** Plaintiff's claims are typical of the claims of other members

34

CLASS ACTION COMPLAINT

of the Classes in that Plaintiff and the members of the Classes sustained damages arising out of Defendant's wrongful conduct, misrepresentations, false statements, concealment, and unlawful practices, and Plaintiff and members of the Classes sustained similar injuries and damages, as a result of Defendant's uniform illegal conduct.

129. **<u>Adequacy</u>:** Plaintiff will fairly and adequately represent and protect the interests of the Classes and has retained counsel competent and experienced in complex class actions to vigorously prosecute this action on behalf of the Classes. Plaintiff has no interests that conflict with or are antagonistic to those of the Classes, and Defendant has no defenses unique to Plaintiff.

130. **<u>Commonality and Predominance</u>:** There are many questions of law and fact common to the claims of Plaintiff and the Classes and those questions predominate over any questions that may affect individual members of the Classes. Common questions for the Classes include, but are not limited to the following:

    a. Whether Defendant violated the Electronic Communications Privacy Act, 18 U.S.C. § 2510 *et seq.*;

    b. Whether Defendant violated the California Invasion of Privacy Act, Cal. Penal Code § 631;

    c. Whether Defendant's use of the Tracking Technology is an unauthorized interception of electronic communications;

    d. Whether Defendant unlawfully intercepted and manipulated user communications;

    e. Whether Defendant was unjustly enriched by collecting and monetizing class members' PHI;

    f. Whether Defendant's practices violated healthcare privacy laws and regulations

    g. Whether Defendant was unjustly enriched by intercepting class

CLASS ACTION COMPLAINT

members' communications;

h. Whether Defendant's representations on the Website were deceptive;

i. Whether Plaintiff and Class Members are entitled to damages and injunctive relief.

131. **Superiority:** There are substantial benefits to proceeding as a class action that render proceeding as a class action superior to any alternatives, including that class-wide adjudication will provide a realistic means for members of the Classes to receive monetary relief; the monetary relief suffered by members of the Classes may be relatively small; it would be substantially less burdensome on the courts and the parties than numerous individual proceedings; many members of the Classes may be unaware that they have equitable recourse for the conduct alleged herein; and because issues common to members of the Classes can be effectively managed in a single proceeding. Plaintiff and his counsel know of no difficulty that could be encountered in the management of this litigation that would preclude its maintenance as a class action.

132. Likewise, particular issues are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include:

a. Whether Defendant obtained proper consent before recording users' interactions with the Website or recording Users' information through the Website;

b. Whether Defendant's actions violated Website visitors' reasonable expectations of privacy; and

c. Whether Defendant's collection of personal and medical information through tracking technology constitutes an invasion of privacy.

133. Finally, all members of the proposed Class are readily ascertainable as

36

CLASS ACTION COMPLAINT

Defendant has access to Class Members' names, emails and physical addresses.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### VIOLATION OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT
### 18 U.S.C §2510, *et seq.*
### (On Behalf of Plaintiff & the Nationwide Class)

134.  Plaintiff repeats and re-alleges all factual allegations contained in the foregoing paragraphs as if fully set forth herein.

135.  Plaintiff brings this claim individually and on behalf of the members of the Class against Defendant.

136.   The ECPA protects both the sending and receipt of communications.

137.  18 U.S.C. § 2520(a) provides a private right of action to any person whose wire, oral, or electronic communication is intercepted.

138.  A violation of the ECPA occurs where any person:
intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any . . . electronic communication" or "intentionally discloses, or endeavors to disclose, to any other person the contents of any . . . electronic communication, knowing or having reason to know that the information was obtained through the [unlawful] interception of a[n] . . . electronic communication" or "intentionally uses, or endeavors to use, the contents of any . . . electronic communication, knowing or having reason to know that the information was obtained through the [unlawful] interception of a[n] . . . electronic communication.

18 U.S.C. §§ 2511(1)(a), (c)-(d).

139.  The ECPA also holds that:

[A] person or entity providing an electronic communication service to the public shall not intentionally divulge the contents of any communication [ ] while in transmission on that service to any person or entity other than an addressee or intended recipient of such communication or an agent of such addressee or intended recipient.

37

CLASS ACTION COMPLAINT

18 U.S.C. § 2511(3)(a).

140.    "Intercept" means "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

141.    "Electronic communication" means "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce." 18 U.S.C. § 2510(12).

142.    "Contents" includes "any information relating to the substance, purport, or meaning" of the communication at issue. 18 U.S.C. § 2510(8).

143.    Whenever Plaintiff and Class members interacted with the Website and completed health screening questionnaires, Defendant, through the Northbeam web tracking technology it embedded in the Website, contemporaneously and intentionally intercepted the contents of Plaintiff's and Class members' electronic communications while those communications were in transmission, and redirected such contents to third parties other than an addressee or intended recipient of such communication.

144.    Whenever Plaintiff and Class members interacted with the Website, Defendant, through at least the Northbeam, Google, and TikTok web tracking technologies embedded on the Website, contemporaneously and intentionally divulged the contents of Plaintiff's and Class members' electronic communications while those communications were in transmission, to each third party other than an addressee or intended recipient of such communication.

145.    Defendant intentionally intercepted and used the contents of Plaintiff's and Class members' electronic communications for unauthorized purposes including disclosing and, on information and belief, profiting from, Plaintiff's and Class members' health-related communications by transmitting the contents to third

38

CLASS ACTION COMPLAINT

parties for marketing analytics and behavioral targeting purposes.

146. Plaintiff and Class members did not authorize Defendant to acquire the content of their communications for purposes of sharing the sensitive health information contained therein with third parties.

147. Defendant's interception and disclosure of Plaintiff's and Class members' electronic communications containing PHI violates HIPAA's criminal provisions, specifically 42 U.S.C. § 1320d-6, which makes it a crime to knowingly and in violation of HIPAA obtain or disclose individually identifiable health information.

148. Defendant intercepted Plaintiff's and Class members' electronic communications for purposes other than providing healthcare services to Plaintiff and Class members without authorization or consent and knowing or having reason to know that the electronic communications were obtained in violation of the ECPA.

149. Defendant's interception of Plaintiff's and Class members' electronic communications was undertaken in furtherance of and to facilitate the commission of the crime of unlawful disclosure of PHI under 42 U.S.C. § 1320d-6.

150. As a direct and proximate result of Defendant's violation of the ECPA, Plaintiff and Class members were damaged by Defendant's conduct in that:

    a. Defendant harmed Plaintiff's and Class members' interest in privacy;

    b. Sensitive and confidential health information that Plaintiff and Class members intended to remain private between them and their healthcare provider is no more;

    c. Defendant eroded the essential confidential nature of their relationship to Website users;

    d. Defendant took something of value from Plaintiff and Class members and derived benefit therefrom without Plaintiff's and Class

CLASS ACTION COMPLAINT

members' authorization, informed consent, or knowledge, and without sharing the benefit of such value;

 e. Plaintiff and Class members did not get the full value of the healthcare services for which they paid or sought, which included Defendant's duty to maintain confidentiality; and

 f. Defendant's actions diminished the value of Plaintiff's and Class members' personal health information.

151. Plaintiff, individually and on behalf of the Class members, seeks all monetary and non-monetary relief allowed by law, including actual damages, statutory damages, punitive damages, preliminary and other equitable or declaratory relief, and attorneys' fees and costs.

## SECOND CAUSE OF ACTION

**VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT**
**Cal. Penal Code § 631, *et seq.***
***(On Behalf of Plaintiff & the Nationwide Class)***

152. Plaintiff repeats and re-alleges all factual allegations contained in the foregoing paragraphs as if fully set forth herein.

153. Plaintiff brings this claim individually and on behalf of the members of the Class.

154. The California Invasion of Privacy Act prohibits (1) the interception or procurement of another to intercept any wire, electronic, or oral communication; (2) the intentional disclosure of the contents of any wire, electronic, or oral communication that the discloser knew or should have known was obtained through the interception of a wire, electronic, or oral communication; and (3) the intentional use of the contents of any wire, electronic, or oral communication that the discloser knew or should have known was obtained through the interception of a wire, electronic, or oral communication. Cal. Penal Code § 631(a).

155. At all relevant times, Plaintiff was physically located in California when

CLASS ACTION COMPLAINT

accessing and using the Website to seek virtual healthcare services.

156. Plaintiff's communications with the Website, including responses to medical screening questions, input of health information, and interactions with the Website's interface, constitute "electronic communications" within the meaning of the CIPA.

157. Through the numerous first- and third-party software implementations embedded on the Website—including tracking technologies, cookies, web beacons, SDKs, pixels, and advertising networks—Defendant intentionally intercepted Plaintiff's electronic communications in real-time as they were transmitted.

158. These tracking technologies constitute devices capable of intercepting electronic communications within the meaning of the CIPA, as they are specifically designed to capture, record, and transmit user interactions and data inputs as they occur.

159. Defendant's interception of Plaintiff's and California Subclass members' electronic communications was accomplished without their consent. Specifically:

   a. Defendant never obtained express consent from Plaintiff or California Subclass members before implementing tracking technologies;

   b. The Website requires users to submit medical information through preliminary screening questions before they can create an account or review any privacy policies;

   c. Tracking and interception begin immediately upon accessing the Website, before any opportunity for users to provide informed consent;

   d. Defendant never provided clear, conspicuous notice that users' electronic communications containing medical information would be intercepted and shared with third parties;

   e. Any purported consent was ineffective because the interception began before consent could be obtained and because the disclosures were inadequate under California law.

41

CLASS ACTION COMPLAINT

160.   The intercepted communications include highly sensitive medical information that Plaintiff and Class members provided with reasonable expectations of privacy and confidentiality, including:

      a.   Responses to health screening questions;

      b.   Medical history and current health conditions;

      c.   Prescription medication information;

      d.   Health insurance details; and

      e.   Other PHI.

161.   Defendant's conduct was willful and intentional, as Defendant deliberately implemented tracking technologies knowing they would intercept users' electronic communications without proper consent.

162.   As a direct and proximate result of Defendant's violations of the CIPA, Plaintiff and Class members have suffered injury, including invasion of privacy, loss of confidentiality of medical information, and violation of their statutory rights.

163.   Plaintiff continues to desire to use virtual healthcare services but has a reasonable fear that electronic communications will continue to be intercepted without consent if using the Website.

164.   Under Cal. Penal Code § 637.2, Plaintiff and Class members are entitled to:

      a.   Actual damages, but not less than liquidated damages computed at the rate of $100 per day for each day of violation or $1,000, whichever is greater;

      b.   Punitive damages;

      c.   Reasonable attorneys' fees and other litigation costs reasonably incurred; and

      d.   Such preliminary and other equitable or declaratory relief as may be appropriate.

CLASS ACTION COMPLAINT

165. Unless enjoined by this Court, Defendant will continue to intercept the electronic communications of Class members and other Website visitors without their consent, causing irreparable harm for which there is no adequate remedy at law.

## THIRD CAUSE OF ACTION

### VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT
### Cal. Penal Code § 632, *et seq.*
### *(On Behalf of Plaintiff & the Nationwide Class)*

166. Plaintiff repeats and re-alleges all factual allegations contained in the foregoing paragraphs as if fully set forth herein.

167. Plaintiff brings this claim individually and on behalf of the members of the Class against Defendant.

168. California Penal Code Section 632(a) provides that "[e]very person who, intentionally and without the consent of all parties to a confidential communication, uses an electronic amplifying or recording device to eavesdrop upon or record the confidential communication, whether the communication is carried on among the parties in the presence of one another or by means of a telegraph, telephone, or other device, except a radio, shall be punished[.]"

169. California Penal Code Section 632(c) defines "confidential communication" as "any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto, but excludes a communication made in a public gathering or in any legislative, judicial, or other public proceeding in which the public is entitled to attend, or in any other circumstance in which the parties to the communication may reasonably expect that the communication may be overheard or recorded."

170. The communications between Plaintiff and Class members and the Website constitute "confidential communications" within the meaning of Section 632(c) because: (a) they were made in the context of seeking confidential healthcare services; (b) users had a reasonable expectation that their health information would

CLASS ACTION COMPLAINT

be kept confidential under HIPAA and state privacy laws; (c) the sensitive nature of health information inherently indicates a desire for confidentiality; and (d) users were not informed that their communications would be recorded and shared with third parties.

171. Defendant intentionally used an electronic recording device—specifically, the Tracking Technology embedded on the Website—to eavesdrop upon and record these confidential healthcare communications.

172. The Tracking Technology constitutes an "electronic amplifying or recording device" within the meaning of Section 632(a) because it is specifically designed to capture, record, and transmit user interactions and communications in real-time for analytics and behavioral tracking purposes.

173. Defendant intentionally implemented and activated this recording technology on its Website with full knowledge that it would capture and record users' confidential healthcare communications, including their responses to sensitive health screening questions.

174. Defendant's recording of Plaintiff's and California Subclass members' confidential healthcare communications was accomplished without the consent of all parties to the communication, specifically: (a) Plaintiff and California Subclass members never consented to having their confidential healthcare communications recorded by third-party analytics companies; (b) Defendant never obtained express consent before implementing the recording technology; (c) users were not informed that their healthcare communications would be recorded and transmitted to at least Northbeam, Google, and TikTok; (d) No clear, conspicuous notice was provided regarding the scope and nature of the recording of confidential medical communications; and (e) The recording began immediately upon accessing the Website, before users had any opportunity to review privacy policies or provide informed consent.

44

CLASS ACTION COMPLAINT

175. Defendant's conduct was undertaken intentionally and with knowledge that the Tracking Technology would record confidential healthcare communications without proper consent from all parties.

176. The confidential communications that were unlawfully recorded include highly sensitive PHI that individuals provided with reasonable expectations of medical confidentiality.

177. As a direct and proximate result of Defendant's violations of Section 632, Plaintiff and Class members have suffered harm including invasion of their privacy rights, violation of medical confidentiality, and loss of control over their sensitive health information.

178. Unless enjoined and restrained by this Court, Defendant will continue to commit these violations. Plaintiff and Class members have a reasonable fear that their confidential healthcare communications will continue to be unlawfully recorded if they use healthcare services through Defendant's Website.

179. Pursuant to California Penal Code Section 637.2, Plaintiff and California Subclass members are entitled to: (a) a preliminary and permanent injunction prohibiting Defendant from continuing their unlawful recording of confidential healthcare communications; (b) statutory damages of $5,000 per violation; (c) punitive damages for Defendant's willful and egregious violations of medical privacy; and (d) any other relief the Court deems proper.

180. Plaintiff and California Subclass members seek all available remedies under California Penal Code Section 632 and related provisions for Defendant's unlawful recording of confidential healthcare communications.

45

CLASS ACTION COMPLAINT

## FOURTH CAUSE OF ACTION

### VIOLATIONS OF CONFIDENTIALITY OF MEDICAL INFORMATION ACT
### California Civil Code §§ 56.06, 56.101, 56.10, 56.36
### *(On Behalf of Plaintiff & the California Subclass)*

181.   Plaintiff incorporates each allegation set forth above as if fully set forth herein and further alleges as follows.

182.   The CMIA defines "medical information" to mean "any individually identifiable information, in electronic or physical form," that is related to a person's "medical history, mental health application information, mental or physical condition, or treatment."

183.   Medical information is "individually identifiable" if it includes or contains "any element of personal identifying information sufficient to allow identification of the individual, such as the patient's name, address, electronic mail address, telephone number, or social security number, or other information that, alone or in combination with other publicly available information, reveals the identity of the individual." Cal. Civ. Code § 56.05(j).

184.   The Website, which offers (1) virtual healthcare services for weight loss and metabolic health, (2) preliminary health screening questions that assess medical conditions, medications, and health history, and (3) online booking and payment for healthcare providers, constitutes a provider of health care services.

185.   The information submitted by Website users through health screening questions, questionnaires, and account creation—and subsequently collected, maintained, and disclosed by Defendant—is medical information because it is individually identifiable information relating to a patient's medical condition and plan of treatment.

186.   That medical information includes but is not limited to Website users' (1) personal contact information, (2) health conditions and concerns collected

46

CLASS ACTION COMPLAINT

through the health screening quiz, (3) medical history collected before account creation, (4) responses to health screening questions about weight, medications, and existing conditions, and (5) treatment preferences and goals.

187. Plaintiff inputted private, personal details and sensitive medical information into the Website, including responses to health screening questions about medical conditions before being permitted to create an account or review privacy policies.

188. Plaintiff visited the Website to facilitate treatment of health conditions and obtain virtual healthcare services.

189. California Civil Code § 56.06(b) states that any "business that offers software or hardware to consumers, including a mobile application or other related device that is designed to maintain medical information in order to make the information available to an individual or health care provider., or for the diagnosis, treatment, or management of a medical condition of the individual, shall be deemed to be a provider of health care subject to the requirements of this part."

190. As a provider of a website and digital health service that facilitates the diagnosis, treatment, and management of medical conditions, Defendant is deemed to be a provider of health care and is subject to the standards of confidentiality with respect to medical information disclosure that are required by the CMIA.

191. As alleged in detail above, through the Tracking Technology embedded on the Website, Defendant knowingly shared Plaintiff's and California Subclass members' medical information with and disclosed that information to at least Northbeam, Google, and TikTok without Plaintiff's and California Subclass members' knowledge or consent.

192. In so doing, Defendant violated Cal. Civ. Code § 56.06(f) by failing to maintain the confidentiality of users' private and personal medical information.

193. Defendant also violated Cal. Civ. Code § 56.101(a) by failing to

CLASS ACTION COMPLAINT

maintain, preserve, and store medical information in a manner that preserves the confidentiality of the information.

194. Instead, Defendant allowed third parties to access and collect Plaintiff's and California Subclass members' private medical information through the Tracking Technology, which these third parties used for their own purposes including targeted advertising and data analytics.

195. California Civil Code § 56.10(a) further provides that a provider of health care "shall not disclose medical information regarding a patient of the provider of health care or an enrollee or subscriber of a health care service plan without first obtaining an authorization."

196. Defendant violated this section of the CMIA when it disclosed Plaintiff's and California Subclass members' medical information to Northbeam, Google, and TikTok through the Tracking Technology without first obtaining Plaintiff's and California Subclass members' authorization to do so.

197. The Website requires users to submit medical information through preliminary screening questions before they can create an account, access services, or review privacy policies, thereby collecting medical information without providing users the opportunity to review data sharing practices or provide informed consent.

198. Defendant's conduct, as described above, violated California Civil Code §§ 56.06, 56.101, and 56.10.

199. Under Civil Code § 56.36(b)(1), Defendant is liable to Plaintiff and each of the California Subclass members for statutory damages of $1,000 per violation, even in the absence of proof of actual damages.

CLASS ACTION COMPLAINT

## FIFTH CAUSE OF ACTION

### VIOLATIONS OF CALIFORNIA CONSUMER PRIVACY ACT
### California Civil Code § 1798.100(a) and (b)
### *(On Behalf of Plaintiff & the California Subclass)*

200.   Plaintiff incorporates each allegation set forth above as if fully set forth herein and further alleges as follows.

201.   Civil Code § 1798.100(a) requires that "A consumer shall have the right to request that a business that collects a consumer's personal information disclose to that consumer the categories and specific pieces of personal information the business has collected."

202.   Civil Code § 1798.100(b) mandates that "A business that collects a consumer's personal information shall, at or before the point of collection, inform consumers as to the categories of personal information to be collected and the purposes for which the categories of personal information shall be used."

203.   These provisions establish a clear requirement: businesses must provide transparent notice about data collection and use at or before the point when personal information is collected.

204.   Defendant violated § 1798.100(b) by collecting personal information through the Website before providing the required disclosures. Specifically, the Website requires users to complete detailed health screening questions before they can create an account, using screening questions that collect sensitive medical information including health conditions and medications. Users must submit this information before they have any opportunity to review privacy policies or data use disclosures, and no notice is provided at or before collection regarding the categories of information collected or purposes of use.

205.   The Website's registration flow is specifically designed to extract medical information from users before they can access any privacy disclosures, in

CLASS ACTION COMPLAINT

direct violation of the "at or before the point of collection" requirement.

206. Even after collection, Defendant's disclosures are inadequate because they fail to inform consumers that their medical information will be: (a) shared with third-party advertising networks including Northbeam, Google, and TikTok; (b) used for behavioral tracking and analytics; and (c) used for purposes beyond healthcare delivery.

207. Defendant's failure to provide clear disclosure at or before collection deprived Plaintiff and California Subclass members of their ability to make informed decisions about whether to share their sensitive medical information.

208. As a direct result of these violations, Plaintiff and California Subclass members suffered harm, including unknowing disclosure of medical information for commercial purposes and deprivation of their privacy rights under the CCPA.

209. Plaintiff and California Subclass members are entitled to declaratory relief that Defendant's practices violate § 1798.100(a) and (b), injunctive relief requiring compliance with disclosure requirements, and any other relief the Court deems proper.

## SIXTH CAUSE OF ACTION

**VIOLATIONS OF CALIFORNIA CONSUMER PRIVACY ACT**
**California Civil Code § 1798.100(c)**
***(On Behalf of Plaintiff & the California Subclass)***

210. Plaintiff incorporates each allegation set forth above as if fully set forth herein and further alleges as follows.

211. The CCPA, at Civil Code § 1798.100(c), provides that "A business shall not collect additional categories of personal information or use personal information collected for additional purposes without providing the consumer with notice consistent with this section."

212. This provision establishes a fundamental purpose limitation principle:

CLASS ACTION COMPLAINT

businesses may only use personal information for the specific purposes disclosed to consumers at or before the point of collection.

213. Defendant collected Plaintiff's and California Subclass members' personal information, including sensitive medical information, through the Website ostensibly for the purpose of providing virtual healthcare services, including weight loss treatment and metabolic health services.

214. At the time of collection, Defendant represented that the medical information would be used to facilitate healthcare services, connect patients with physicians, and manage treatment.

215. However, Defendant subsequently used and continues to use this medical information for additional, undisclosed purposes, including but not limited to: (a) targeted advertising through third-party advertising networks including Northbeam, Google, and TikTok; (b) commercial data monetization; (c) behavioral tracking and profiling; and (d) marketing optimization and lead generation.

216. These advertising and analytics purposes are materially different from and incompatible with the healthcare purposes for which the information was collected.

217. Defendant never provided notice to Plaintiff or California Subclass members that their medical information would be used for advertising, analytics, or other commercial purposes beyond healthcare delivery.

218. Defendant's use of medical information for undisclosed purposes violated § 1798.100(c) and caused harm to Plaintiff and California Subclass members, including loss of privacy, unauthorized commercialization of their medical data, and exposure to targeted advertising based on their health conditions.

219. Plaintiff and California Subclass members are entitled to injunctive relief, actual damages, and any other relief the Court deems proper for these violations.

51

CLASS ACTION COMPLAINT

## SEVENTH CAUSE OF ACTION

**VIOLATIONS OF CALIFORNIA CONSUMER PRIVACY ACT**
**California Civil Code § 1798.150(a)(1)**
***(On Behalf of Plaintiff & the California Subclass)***

220. Plaintiff incorporates each allegation set forth above as if fully set forth herein and further alleges as follows.

221. In 2018, California consumers voted into law the California Consumer Privacy Act ("CCPA") which provides California consumers the right to learn what information a business has collected about them, to delete their personal information, to stop businesses from selling their personal information, including using it to target them with ads, and to hold businesses accountable if they do not take reasonable steps to safeguard protected information.

222. In further protecting consumers' rights, including the constitutional right to privacy, the CCPA states that one purpose and intent of the act is to allow consumers "to control the use of their personal information, including limiting the use of their sensitive personal information, the unauthorized use or disclosure of which creates a heightened risk of harm to the consumer," and to provide consumers with "meaningful options" over how information is collected, used, and disclosed.

223. To that end, businesses are required to inform consumers specifically and clearly about how those businesses collect and use personal information and how consumers can exercise their rights and choices.

224. Subsection (e) of § 1798.100 requires a business that collects consumer personal information to "implement reasonable security procedures and practices appropriate to the nature of the personal information to protect the personal information from unauthorized or illegal access, destruction, use, modification, or disclosure in accordance with Section 1798.81.5."

225. Similarly, California Civil Code § 1798.81.5(b) provides that a

52

CLASS ACTION COMPLAINT

"business that owns, licenses, or maintains personal information about a California resident shall implement and maintain reasonable security procedures and practices appropriate to the nature of the information, to protect the personal information from unauthorized access, destruction, use, modification, or disclosure."

226. The CCPA defines "personal information" to include an individual's first name or first initial and last name in combination with medical information, health insurance information, unique biometric data, and other sensitive categories. California Civil Code § 1798.81.5(d)(1)(A).

227. Subsection (d)(2) of § 1798.81.5 further defines "medical information" as "any individually identifiable information, in electronic or physical form, regarding the individual's medical history or medical treatment or diagnosis by a health care professional."

228. As alleged in detail above, Defendant fails to adequately disclose that users' sensitive medical information collected through preliminary screening questions and medical questionnaires is shared with Northbeam, Google, and TikTok.

229. The Website requires users to submit detailed medical information through screening questions before they can create an account or review privacy policies, thereby collecting sensitive personal information without first providing users the opportunity to understand how their data will be shared.

230. Defendant's sharing of medical information with third parties including Northbeam, Google, and TikTok for analytics, advertising, and commercial purposes goes well beyond the disclosed purposes of facilitating virtual healthcare services and is a clear breach of Defendant's duties required under Civil Code § 1798.150(a)(1).

231. Further, Defendant's disclosure to third parties of and the unauthorized access by third parties to Plaintiff's and California Subclass members' personal

53

CLASS ACTION COMPLAINT

information, including medical information, through the Tracking Technology constitute violations of Defendant's duty to implement and maintain reasonable security procedures and practices to safeguard such sensitive information, and thus constitute a violation of § 1798.150(a)(1) of the CCPA.

232.   Plaintiff will provide pre-suit notice to Defendant pursuant to Cal. Civ. Code § 1798.150(b), and currently seeks only injunctive and declaratory relief for violations not subject to the notice requirement.

233.   Plaintiff will amend this Complaint when the statutory notice period has passed to seek statutory damages.

234.   Plaintiff and Class Members seek injunctive relief pursuant to Cal. Civ. Code § 1798.150(a)(1)(B) to require Defendant to cease the unlawful transmission of PHI and PII and implement practices to protect sensitive personal medical information of the Website users.

### EIGHTH CAUSE OF ACTION

**UNJUST ENRICHMENT**
***(On Behalf of Plaintiff & the Nationwide Class)***

235.   Plaintiff repeats and re-alleges all factual allegations contained in the foregoing paragraphs as if fully set forth herein.

236.   Plaintiff brings this claim individually and on behalf of the members of the Class against Defendant.

237.   Defendant has been unjustly enriched at the expense of Plaintiff and Class members through its unauthorized collection, use, and monetization of their PHI and personal data.

238.   Plaintiff and Class members conferred a benefit upon Defendant by providing valuable PHI, including sensitive health data, medical histories, and personal identifiers, through their use of the Website.

239.   Individual health records command premium prices in data markets,

CLASS ACTION COMPLAINT

valued as much as 50 times more than credit card information due to their comprehensive nature and permanence.

240. Health information commands exceptional value due to its predictive power and marketing utility.

241. Defendant received and retained this benefit by intercepting, collecting, and transmitting Plaintiff's and Class members' PHI to third parties through embedded technology without authorization or consent.

242. Defendant has been unjustly enriched through several mechanisms:

a. Data Monetization: Defendant derives commercial value from sharing users' PHI with third parties for marketing analytics, behavioral targeting, and user profiling purposes;

b. Cost Avoidance: Defendant avoided the substantial costs of obtaining proper consent, implementing adequate privacy protections, and securing lawful access to this valuable health data;

c. Competitive Advantage: Defendant gained unfair competitive advantages by leveraging detailed health data profiles to optimize its platform and marketing without bearing the costs associated with compliant data collection.

d. Enhanced Platform Value: The unauthorized collection of comprehensive user health data increases the overall value and effectiveness of Defendant's telehealth platform.

243. Defendant obtained this benefit through unlawful interception and unauthorized disclosure of PHI in violation of HIPAA, ECPA, and/or Cal. Penal Code §§ 631-632.

244. Whereas Plaintiff and Class members provided this valuable information in the context of seeking confidential healthcare services with a reasonable expectation of privacy and HIPAA compliance, Defendant actively

CLASS ACTION COMPLAINT

concealed its data collection and sharing practices from users who were unaware their health information was being intercepted and monetized.

245.   Defendant's retention of these benefits violates fundamental principles of fairness and equity, as Defendant has profited from the unauthorized exploitation of some of the most sensitive and valuable personal information—PHI—without providing any compensation or benefit to the individuals whose privacy was violated.

246.   Plaintiff and Class members have no adequate remedy at law for Defendant's Unjust Enrichment, as they cannot recover the specific value of their appropriated health data through traditional damages calculations.

247.   As a direct and proximate result of Defendant's Unjust Enrichment, Plaintiff and Class members are entitled to restitution and disgorgement of all benefits, profits, and value that Defendant has obtained through the unauthorized collection and use of their PHI.

248.   Plaintiff and Class members seek judgment requiring Defendant to disgorge all profits, benefits, and value obtained through its unlawful conduct, together with interest thereon, and such other relief as the Court deems just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff John Avots-Smith individually and on behalf of all others similarly situated, respectfully requests that this Court enter judgment against Defendant Thrive Health Group, Inc. d/b/a Fridays and in favor of Plaintiff and the Class, and grant the following relief:

A.    Certify this case as a class action on behalf of the Classes defined above, appoint Plaintiff as class representative, and appoint Plaintiff's counsel as class counsel;

B.    Enter a judgment finding that Defendant's actions, as described

CLASS ACTION COMPLAINT

herein, violate the Electronic Communications Privacy Act (18 U.S.C. §2510 *et seq.*), the California Invasion of Privacy Act (Cal. Penal Code §§ 631, 632), the Confidentiality of Medical Information Act (Cal. Civ. Code §§ 56.06, 56.10, 56.101), and the California Consumer Privacy Act (Cal. Civ. Code §§ 1798.100, 1798.150);

C.     Award injunctive and other equitable relief as necessary to protect the interests of Plaintiff and the Classes including:

i.   An order prohibiting Defendant from engaging in the wrongful and unlawful acts described herein;

ii.  An order requiring Defendant to implement proper notice and consent mechanisms before using tracking technology;

iii. An order requiring Defendant to destroy all data collected through unlawful monitoring practices;

D.     Award statutory damages to Plaintiff and the Classes under the Electronic Communications Privacy Act, 18 U.S.C. § 2520(c)(2), in the amount of the greater of $100 per day for each day of violation or $10,000 per violation, or actual damages and any profits made by Defendant, whichever is greater;

E.     Award statutory damages to Plaintiff and the California Subclass under the California Invasion of Privacy Act Cal. Penal Code § 631, *et seq.* in the amount of $1,000 or actual damages, whichever is greater.

F.     Award statutory damages to Plaintiff and the California Subclass under the Confidentiality of Medical Information

57

CLASS ACTION COMPLAINT

Act, Cal. Civ. Code § 56.36(b)(1), in the amount of $1,000 per violation;

G.    Award statutory damages to Plaintiff and the California Subclass under the California Consumer Privacy Act, Cal. Civ. Code § 1798.150(a)(1)(A), in the amount of not less than $100 and not greater than $750 per consumer per incident, or actual damages, whichever is greater;

H.    Award statutory damages to Plaintiff and the California Subclass under the California Invasion of Privacy Act, Cal. Penal Code § 632, in the amount of $5,000 per violation;

I.    Award restitution and disgorgement of Defendant's Unjust Enrichment, including all revenue derived from their unlawful business practices;

J.    Award Plaintiff and the Classes reasonable litigation expenses and attorneys' fees;

K.    Award Plaintiff and the Classes pre- and post-judgment interest to the extent allowable; and

L.    Award such other and further relief as equity and justice may require.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury for all issues so triable.

Dated: January 7, 2026        Respectfully submitted,

*/s/ Matthew J. Langley*
Matthew J. Langley (SBN 342286)
**ALMEIDA LAW GROUP LLC**
849 W. Webster Avenue
Chicago, Illinois 60614
t: 773-554-9354

58

CLASS ACTION COMPLAINT

matt@almeidalawgroup.com

*Attorney for Plaintiff & the Putative Classes*

CLASS ACTION COMPLAINT